**In re METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION.**

**This document relates to: Hope Koch, et al. v. John R. Hicks, et al., 05 Civ. 5745**

**Nos. 1:00–1898, MDL 1358(SAS), M 21–88.**

United States District Court, S.D. New York.

Feb. 20, 2007.

Scott D. Shellenberger, Mary V. McNamara–Koch, James R. Cox, Karyn S. Bergmann, Offices of Peter G. Angelos, Baltimore, MD, David A.P. Brower, Brower Priven, a Professional Corporation, New York, NY, Marshall N. Perkins, Brower Piven, a Professional Corporation, The World Trade Cen-

ter–Baltimore, Baltimore, MD, Lon Engel, Engel & Engel, P.A., Baltimore, MD, for Plaintiff Hope Koch, et al. and Certified Class.

Andrew Gendron, Michael J. De Vinne, Venable LLP, Baltimore, MD, Peter John Sacripanti, James A. Pardo, Stephen J. Riccardulli, McDermott Will & Emery, New York, NY, for Defendant Exxon Mobil Corporation.

Paul W. Ishak, Stark & Keenan, P.A, Bel Air, MD, for Defendant John R. Hicks.

Robin Greenwald, Robert Gordon, C. Sanders McNew, Weitz & Luxenberg, P.C., New York, NY, for Plaintiffs.

Peter John Sacripanti, James A. Pardo, Stephen J. Riccardulli, McDermott, Will & Emergy LLP, New York, NY, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. INTRODUCTION

The Crossroads Exxon gasoline station in Fallston, Maryland, is one of hundreds of thousands of stations across the country that stores its gasoline in underground tanks. Residents and homeowners who live nearby have sued Exxon Mobil Corporation and the owner of the station ("Defendants") because, according to the allegations, the station's underground tanks have been leaking gasoline with methyl tertiary butyl ether ("MTBE").[1] These individual residents and homeowners have brought claims under Maryland law for (1) public nuisance, (2) private nuisance, (3) trespass to property, (4) negligence, and (5) strict liability for an abnormally dangerous activity.[2] The individual plaintiffs include: (1) Hope and Frank Koch, (2) Gail and Rob-

ert Kurtz, (3) Alora Roche and her son, Drake Roche, and (4) Jennifer and Timothy Stevens.[3]

These individual plaintiffs ("Plaintiffs") now move under Rule 23 of the Federal Rules of Civil Procedure for the Court to certify two subclasses and to appoint them as representatives.[4] The two subclasses include:

1. Homeowner Subclass: "This class consists of all persons owning real property in the vicinity of the Crossroads Exxon who have suffered a legally cognizable injury due to the contamination, including (1) those homeowners who have experienced interference with the quiet enjoyment of their property by the actual or threatened presence of MTBE and other gasoline constituents on/in their land and in their water supply wells; (2) those homeowners whose wells have or have had detectable levels of MTBE and other gasoline constituents and whose property requires restoration or remediation; and/or (3) those homeowners whose properties have suffered diminution in market value as a result of MTBE contamination emanating from the Crossroads Exxon." [5]

2. Medical Monitoring Subclass: "All persons residing in the area from 1989 until the present (inclusive) who have consumed and/or used groundwater drawn from a supply well in the vicinity of the Crossroads Exxon." [6]

For the reasons below, Plaintiffs' motion for certification of the Homeowner Subclass is granted. The motion for certification of the Medical Monitoring Subclass is denied.

---

1. *See* First Amended Class Action Complaint ("Compl.") ¶¶ 4–5.

2. *See id.* ¶¶ 44–80. The individual plaintiffs have also brought a claim of "medical monitoring." *See id.* ¶¶ 81–95. As explained below, medical monitoring is a type of damages, or remedy, under Maryland law rather than a separate claim. *See infra* Part IV. Thus, while Plaintiffs will need to present evidence of damages incurred as a result of medical monitoring at summary judgment and trial, they cannot pursue an

independent claim for the costs of medical monitoring.

3. Compl. ¶ 3.

4. *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Pl. Mem.").

5. *Id.* at 2–3.

6. *Id.* at 3.

## II. BACKGROUND ON LEAKING UNDERGROUND STORAGE TANKS AND MTBE

"Each year approximately 9 million gallons of gasoline (the equivalent of a full super-tanker) are released to the environment in the United States from leaks and spills, according to an estimate by the Alliance for Proper Gasoline Handling." [7] Much of this gasoline contains MTBE, a chemical compound that many companies have added to gasoline since 1979.[8] "It is an oxygenate, meaning it increases the oxygen content of the gasoline. It is also a source of octane in gasoline." [9]

"While the use of MTBE as a fuel additive in gasoline has helped to reduce harmful air emissions, it has also caused widespread and serious contamination of the nation's drinking water supplies." [10] A major problem with MTBE is that it "dissolves and spreads readily in the groundwater underlying a spill site, resists biodegradation, and is difficult and costly to remove from groundwater." [11] "It is known to be carcinogenic in animals and is potentially cancer-causing in humans, as well." [12]

Underground storage tanks, or "USTs," are among the main sources of MTBE groundwater contamination.[13] In 1984, there were more than two million underground storage tanks, "most of which were located at gas stations across the country." [14] According to the General Accounting Office, "by September 2000, approximately 1.5 million tanks had been permanently closed, leaving an estimated 693,107 tanks subject to federal UST program requirements." [15]

"Leaking USTs have been identified as the likely sources of a number of the more problematic releases of MTBE to the environment, including releases that have closed water supplies in Santa Monica and Glennville, California." [16] For example, in California, "the minimum number of MTBE point sources from leaking UST sites is estimated at greater than 10,000." [17] Likewise, in this case, Plaintiffs live near underground storage tanks that they allege have been leaking gasoline with MTBE into the ground and they seek to represent two classes of people who have been harmed: The Homeowner Subclass and the Medical Monitoring Subclass.

7. Methyl Tertiary–Butyl Ether (MTBE): Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline ("MTBE Advance Notice of Intent"), 65 Fed.Reg. 16,094, 16,095 (Mar. 24, 2000).

8. *See* Application for Methyl Tertiary Butyl Ether, Decision of the Administrator, 44 Fed. Reg. 12,242, 12,243. (Mar. 6, 1979). By 2000, about 87% of reformulated gasoline contained MTBE. *See* MTBE Advance Notice of Intent at 16,097.

9. MTBE Advance Notice of Intent at 16,094.

10. *Id.* at 16,096–97.

11. *Id.* at 16,096.

12. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 341 F.Supp.2d 386, 392 (S.D.N.Y.2004).

13. *See* MTBE Advance Notice of Intent at 16,-100–01; *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 330 n. 5 (S.D.N.Y.2002) ("A government study conducted over an eight-year period from 1993–2000 concluded that releases from underground gasoline storage systems ['USTs'] are the main source of MTBE groundwater contamination."); *see generally* E. Blaine Rawson, *Are We Properly Controlling Our LUSTs?: A Review of the Problems With Underground Storage Tank Regulation*, 40 Idaho L.Rev. 111 (2003).

14. U.S. Gen. Accounting Office, Pub. No. GAO–01–464, *Environmental Protection: Improved Inspections and Enforcement Would Better Ensure the Safety of Underground Storage Tanks* at 1 (May 4, 2001), *available at* http://www.gao.gov/new.items/d01464.pdf.

15. *Id.*

16. MTBE Advance Notice of Intent at 16,101. "The petroleum industry, however, takes the position that the magnitude of the groundwater contamination caused by MTBE from leaking UST[s] has been exceedingly modest.... The industry notes that MTBE has been found in measurable levels in only 1.9% of the public water supply systems in California since the legislature required monitoring for MTBE." Thomas O. McGarity, *MTBE: A Precautionary Tale*, 28 Harv. Envtl. L.Rev. 281, 286 (2004) (citations omitted).

17. MTBE Advance Notice of Intent at 16,101.

## III. THE LAW OF THE TRANSFEROR CIRCUIT APPLIES TO CLASS CERTIFICATIONS IN MULTI–DISTRICT LITIGATION ("MDL")

■ A threshold issue to address before considering if Plaintiffs' proposed class should be certified is whether the law of the transferor circuit (*i.e.,* Fourth Circuit) or the law of the transferee circuit (*i.e.,* Second Circuit) should control. On January 3, 2007, this Court held in another case assigned to this MDL that the law of the transferor circuit applies when deciding motions for class certification under Rule 23.[18] Nonetheless, Defendants submit "that this Court must apply the law of the Second Circuit ... to the Plaintiffs' Motion for Class Certification" because the Court's previous opinion is contrary to "established" Second Circuit law.[19]

### A. The Second Circuit's Decision in *Menowitz* Does Not Establish Which Circuit's Law Applies on a Motion for Class Certification

The primary Second Circuit case on which Defendants rely is *Menowitz v. Brown,*[20] and there are at least two problems with this reliance. The first is that *Menowitz* was an appeal of a motion to dismiss—not class certification—so it does not qualify as established Second Circuit law on the issue of which circuit's law controls when deciding whether to certify a class under Rule 23. In fact, the decision that this Court issued on January 3, 2007, explained that "[i]n the context of pre-trial issues *such as motions to dismiss* or discovery disputes, section 1407 requires the application of the law of the transferee circuit where the motions are being considered."[21] But these cases do not resolve what law to apply on a class certification because "whether to certify an action on behalf of a class under Rule 23 is not merely a pretrial issue."[22]

The second problem with the Defendants' argument is it ignores the Supreme Court's decision in *Lexecon v. Milberg Weiss Bershad Hynes & Lerach,*[23] which substantially undermines the Second Circuit's holding in *Menowitz.*[24] "Prior to *Lexecon,* the vast majority of cases were settled or resolved by summary judgment in the transferee court, or *else transferred under section 1404(a) to that same transferee court for joint trial."*[25] So long as most transferee courts engaged in a self-transfer, and thus presided over the trial, it was just and efficient for the law of that circuit to apply.

However, the Supreme Court made it clear in *Lexecon* that "[s]uch self-transfers are no longer permitted."[26] This Court has previously explained:

> [A]s a result of *Lexecon,* several thousands of actions, as opposed to a hundred or so, are remanded on a yearly basis for trial-a fact that significantly undermines the rationale offered by the concurrence in *In re Korean Air Lines* (and followed by the Second Circuit in *Menowitz v. Brown* ) for why courts should not consider themselves bound by the opinions of the transferor circuits.[27]

■ "It is well established that lower courts are bound not only by the specific

---

18. *In re MTBE Prods. Liab. Litig.,* 241 F.R.D. 435, 439–42, 2007 WL 25474, at \*2–4 (S.D.N.Y. 2007).

19. Defendant Exxon Mobil Corporation's Supplemental Memorandum in Opposition to Plaintiff's Motion for Class Certification ("Def.Supp.Mem.") at 5.

20. 991 F.2d 36 (2d Cir.1993). This Court was familiar with *Menowitz. See In re MTBE Prods. Liab. Litig.,* 241 F.R.D. at 441–42, 2007 WL 25474, at \*4 (discussing *Menowitz* ); *In re MTBE Prods. Liab. Litig.,* No. M21–88, MDL 1358, 2005 WL 106936, at \*4 (S.D.N.Y. Jan.18, 2005) (discussing *Menowitz* and other circuit cases).

21. *In re MTBE Prods. Liab. Litig.,* 241 F.R.D. at 439, 2007 WL 25474, at \*2 (emphasis added).

22. *Id.*

23. 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998).

24. *See In re MTBE Prods. Liab. Litig.,* 2005 WL 106936, at \*4.

25. *Id.* (citation and quotation marks removed) (emphasis in original).

26. *Id.* (discussing *Lexecon* ).

27. *Id.*

holding of a Supreme Court opinion but also its reasoning," [28] and *Lexecon* substantially undercut the reasoning offered to support the Second Circuit's decision in *Menowitz* and other similar cases. Indeed, after *Lexecon*, "it is necessary to re-evaluate whether this Court should follow the law of the Second Circuit or the law of the transferor circuits when interpreting federal law." [29] Thus, contrary to Defendants' assertion, there is no controlling or "established" Second Circuit law on the issue of which circuit's law should apply when deciding a motion for class certification.

### B. The Decisions of Other District Courts Are Not Persuasive

Defendants also argue that "[o]ther courts, relying on the same authority [*i.e.*, *Menowitz* and *In re Korean Air Lines* ], have expressly applied this rule to issues of class certification." [30] In support of this statement, Defendants cite two unpublished district court opinions involving class certifications in the context of multi-district litigation: *In re General Motors Corporation "Piston Slap" Products Liability Litigation* from the Western District of Oklahoma [31] and *In re Compensation of Managerial, Professional & Technical Employees Antitrust Litigation* from the District of New Jersey.[32]

Because neither of these decisions control the decisions of this Court, they are inapposite on the question of whether the Second Circuit has already decided this issue. Moreover, while the decisions of other federal courts warrant consideration, these opinions are not persuasive for the simple reason that they pre-date the Supreme Court's decision in *Lexecon* and thus suffer from the same infirmities that this Court has already discussed. Finally, the opinions do not provide any significant discussion, much less persuasive reasons, as to why courts are bound by the law of the transferee circuit

when considering a Rule 23 motion in a case transferred under the multi-district statute.

### B. Summary of Court's Previous Decisions

Given the extensive discussion that this Court has now provided in two prior opinions, as well as this opinion, on the issue of what circuit's law is binding in multi-district litigation, a summary of these holdings is useful. After the Supreme Court's decision in *Lexecon*, courts should reconsider which circuit's law will be binding in an action transferred to it under section 1407 of Title 28 of the United States Code. In *Lexecon*, the Supreme Court explained that "courts must begin their analysis by looking at the language of a statute" and "do their job of reading the statute as a whole." [33] Of course, when the plain language of a statute does not resolve an issue, legislative history may be consulted to resolve the ambiguity.

In this case, as in all multi-district litigation, the actions were transferred pursuant to section 1407. This statute states in pertinent part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and *will promote the just and efficient conduct of such actions*. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it

---

28. *Id.*

29. *Id.*

30. Def. Supp. Mem. at 5.

31. No. MDL 04–1 600, 2006 WL 1049259, at *2 n. 6 (W.D.Okla. Apr.19, 2006) (citing *In re*

*Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir.1996)).

32. No. MDL 1471, 2006 WL 38937, at *2 (D.N.J. Jan.5, 2006) (citing *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1174–76 (D.C.Cir.1987)).

33. *Id.*

was transferred unless it shall have been previously terminated.... [34]

"The plain language of the statute does not explicitly resolve the issue of which circuit's law is binding, but it is important that section 1407 only allows cases to be transferred on the condition that such coordination 'will promote the just and efficient conduct of such actions.'" [35] "[T]he phrase 'just and efficient' as used in section 1407 has a distinct meaning in that it encompasses the statute's goal of eliminating 'delay, confusion, conflict, inordinate expense and inefficiency' during the pretrial period." [36]

■ "In the context of pre-trial issues such as motions to dismiss or discovery disputes, section 1407 requires the application of the law of the transferee circuit where the motions are being considered." [37] The statute requires the transferee law to apply to these motions primarily because it would be grossly inefficient for the court "to follow the opinions offered by the many circuits from which the cases were transferred" when considering pretrial issues such as whether to dismiss a complaint or a discovery dispute. As this Court has explained:

> without limiting the sources of binding precedent, each motion in multi-district litigation could easily turn into a review of the interpretations of all or most of the circuits, a result at odds with the fundamental purpose of section 1407. This would have a debilitating effect on the court's ability to resolve motions in a timely and efficient manner.[38]

Thus, this Court has agreed with those courts that "have held that the law of the transferee circuit controls pretrial issues such as whether the court has subject matter or personal jurisdiction over the action, or whether the cases should be remanded to state court because the cases were not properly removed." [39] "Likewise, the law of the transferee circuit controls discovery issues such as whether to compel a deposition or documents pursuant to a subpoena." [40]

■ "However, whether to certify an action on behalf of a class under Rule 23 is not merely a pretrial issue." [41] The requirements of class certification are inherently enmeshed with considerations of the trial, and under *Lexecon* the authority of the transferee court in multi-district proceedings ends once the pretrial proceedings are completed. "It would be neither just nor efficient to apply the law of this Circuit in considering class certification, and then force the transferor court to try a class action that it might never have certified." [42] Moreover, "[n]either party should be prejudiced in preparing for trial because the case was removed and transferred to another district in a different circuit." [43] "Thus, in considering a motion for class certification of state claims under Rule 23, the law of the transferor circuit controls because that is the law that will bind the trial court and class certification is an issue on which the Supreme Court has directed courts to ensure that the requirements of Rule 23 are satisfied for purposes of trial." [44]

## IV. CLASS CERTIFICATION RE-QUIREMENTS

■ To maintain an action on behalf of the two subclasses, Plaintiffs must satisfy Rule 23. "Under the Rule, certification of a class action, whether a mass tort action or not, requires that the action meet the re-

**34.** 28 U.S.C. § 1407(a) (2006) (emphasis added).

**35.** *In re MTBE Prods. Liab. Litig.,* 2005 WL 106936, at *5 (quoting 28 U.S.C. § 1407).

**36.** *Id.*

**37.** *In re MTBE Prods. Liab. Litig.,* 241 F.R.D. at 439, 2007 WL 25474, at *2.

**38.** *In re MTBE Prods. Liab. Litig.,* 2005 WL 106936, at *5.

**39.** *In re MTBE Prods. Liab. Litig.,* 241 F.R.D. at 439, 2007 WL 25474, at *2.

**40.** *Id.*

**41.** *Id.*

**42.** *Id.*

**43.** *Id.*

**44.** *Id.*

quirements of a two-step test."[45] In the first step, "the class must comply with the four prerequisites established in Rule 23(a): (1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation."[46] In addition, although "not specified in Rule 23, the court must be able to ascertain the general boundaries of the proposed class at the outset of the litigation, and the named plaintiffs must be members of the proposed class."[47] In the second step, Plaintiffs must demonstrate that the proposed class is "maintainable" as a class by fulfilling one of the requirements of Rule 23(b).[48]

"[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action,"[49] and courts subject a motion for class certification under Rule 23 to a "rigorous analysis" to ensure that its requirements are satisfied.[50] In the Fourth Circuit, this means that·

> "[b]efore deciding whether to allow a case to proceed as a class action ... a judge should make whatever factual and legal inquiries are necessary under Rule 23.... And if some of the· considerations under Rule 23(b)(3) ... overlap the merits ... then the judge must make a preliminary inquiry into the merits."[51]

The district court must take a "close look" at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification.[52] "The party seeking certification must bear the burden to establish that the action meets the requirements for class certification."[53] Under Rule 23, "a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."[54]

"If a lawsuit meets these requirements, certification as a class action serves important public purposes. In addition to promoting judicial economy and efficiency, class actions also 'afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions.'"[55] For these reasons, courts are to "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and ... promote judicial efficiency."[56]

Finally, the Fourth Circuit has held that "often an action may qualify under both (b)(1) and (b)(3)."[57] The difference between the two types of certification is significant because "when an action is certified under (b)(1) ... all party members become manda-

**45.** *In re A.H. Robins Co.*, 880 F.2d 709, 727 (4th Cir.1989).

**46.** *Id.*

**47.** *Id.* at 728. *Accord Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir.1976).

**48.** *See In re A.H. Robins*, 880 F.2d at 728.

**49.** *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).

**50.** *General Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

**51.** *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir.2004) (quoting *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 676 (7th Cir.2001)).

**52.** *Id.* at 365 (internal quotations omitted).

**53.** *In re A.H. Robins*, 880 F.2d at 728.

**54.** Fed.R.Civ.P. 23(c)(4)(b). *See also Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir.1993).

**55.** *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir.2003) (quoting 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.02 (3d ed.1999)).

**56.** *Id.* (quoting *In re A.H. Robins*, 880 F.2d at 740 (internal quotation marks omitted)). A court also has broad discretion in determining whether a proposed class complies with Rule 23. *See Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir.1993); *Roman*, 550 F.2d at 1348.

**57.** *In re·A.H. Robins*, 880 F.2d at 728 (citations omitted). In this case, Plaintiffs argue that the proposed classes satisfy Rule 23(b)(1), (b)(2), and (b)(3).

tory class members without any opt-out rights; if certified under (b)(3), however, any class member may opt out."[58] If an action qualifies for class certification under Rule 23(b)(1) and (b)(3), then it should be certified under (b)(1) "so that the judgment will have res judicata effect as to all the class" and thereby further the policy underlying (b)(1) class actions.[59]

## IV. THE HOMEOWNER SUBCLASS SATISFIES RULE 23

■■■■ Courts have repeatedly certified class actions involving claims that property was harmed by seepage of contaminants such as oil or chemicals or waste.[60] Indeed, Rule 23 of the Federal Rules of Civil Procedure is well-suited to resolving such tort claims on a class-wide basis because the claims involve a single source of harm or course of conduct. Liability may be decided with one decision: a jury decides whether defendants committed the alleged tort that harmed the entire class in a similar, although not identical, way. In this case, for example, Defendants either committed the alleged torts or they did not commit them. The answer to this question should be the same for every member of the class.

Nonetheless, Defendants raise three primary arguments in their opposition to class certification.[61] *First*, they argue that the class members cannot be ascertained.[62] *Second*, Defendants contend that no member of the class, including the proposed representatives of the class, can satisfy the adequacy requirement of Rule 23(a)(4).[63] *Third*, Defendants argue that the class may not be certified under Rule 23(b)(1) because Plaintiffs primarily seek money damages.

### A. Ascertainability

Defendants argue that the proposed class is not ascertainable because Plaintiffs concede "the exact shape and size of the affected area has not been delineated at this stage of the litigation."[64] Plaintiffs "believe the affected area comprises the contaminated area plus a buffer zone less than 20 square miles in size."[65] Plaintiffs have also proffered the testimony of hydrogeology expert Richard K. Spruill, Ph.D. ("Spruill").

■■■ Defendants' argument is flawed because Rule 23 does not require that Plaintiffs identify every member at this stage—it is the class, not each member, that must be ascertained.[66] In fact, it would be impossible in

58. *Id.* (citations omitted).

59. *Id.* (quoting 3B James Wm. Moore et al., *Moore's Federal Practice,* ¶ 23.31[3], pp. 236–37 (2d ed.1987)). *Accord Lutz v. International Ass'n of Machinists and Aerospace Workers,* 196 F.R.D. 447, 453 n. 8 (E.D.Va.2000) (citing *A.H. Robins* ); *Kohl v. Association of Trial Lawyers of Am.,* 183 F.R.D. 475, 486 (D.Md.1998) (discussing *A.H. Robins* ).

60. *See Mejdrech v. Met–Coil Systems Corp.,* 319 F.3d 910, 911 (7th Cir.2003) (affirming class certification involving allegation that leaking storage tank on factory owner's property contaminated soil and groundwater beneath class members' homes); *Petrovic v. Amoco,* 200 F.3d 1140, 1144 (8th Cir.1999) (affirming class certification of a settlement in which plaintiffs "sought injunctive and monetary relief for pollution to their property that allegedly occurred as a result of underground oil seepage originating from an Amoco petroleum refinery"); *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188 (6th Cir.1988) (affirming certification of class involving "plaintiffs, who either lived or owned property near defendant's landfill, brought a class action for personal injuries and property damage resulting from

hazardous chemicals leaking from the landfill and contaminating the local water supply"); *see also In re MTBE Prods. Liab. Litig.,* 241 F.R.D. at 446–47, 2007 WL 25474, at *9; *Bentley v. Honeywell Intern., Inc.,* 223 F.R.D. 471, 486–87 (S.D.Ohio 2004); *Ludwig v. Pilkington North Am., Inc.,* No. 03 Civ. 1086, 2003 WL 22478842, at *5 (N.D.Ill. Nov. 4, 2003); *Bates v. Tenco Services, Inc.,* 132 F.R.D. 160, 163–64 (D.S.C. 1990); *Wehner v. Syntex Corp.,* 117 F.R.D. 641, 643 (N.D.Cal.1987).

61. *See* Defendant Exxon Mobil Corporation's Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Def. Mem."); Def. Supp. Mem.

62. *See* Def. Mem. at 2–13.

63. *See id.* at 13–17.

64. *Id.* at 4 (quoting Pl. Mem. at 2 n. 1).

65. Pl. Mem. at 2 n. 1.

66. See Fed.R.Civ.P. 23(c) ("An order certifying a class action must define *the class* ....") (emphasis added); *see also Peoples v. Wendover Funding, Inc.,* 179 F.R.D. 492, 496 (D.Md.1998) ("Though

this case, and many others, to identify each member of the proposed class at class certification because that determination depends upon the jury making certain findings of fact upon which the class definition depends. For example, to ascertain the identify of class members, a jury will first need to decide how the MTBE spread after the underground storage tank leaked it into the ground.[67]

▮ The ascertainability of a class depends on whether there will be a definitive membership in the class once judgment is rendered.[68] Indeed, the Fourth Circuit has held that "[w]here the plaintiff has demonstrated that the class of persons he or she wishes to represent exists, that they are not specifically identifiable *supports* rather than bars the bringing of a class action, because joinder is impracticable." [69] In this case, the Homeowner Subclass is ascertainable because Plaintiffs have defined it in objective terms, and the Court will be able to determine the members of the class once a jury makes its findings of fact.[70] The ascertainability requirement is therefore satisfied.

## B. Numerosity

▮ Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." [71] In *Lilly v. Harris–Teeter Supermarket*,[72] the Fourth Circuit held that a class with 229 members is "easily enough" [73] to satisfy Rule 23. Moreover, lower courts in the Fourth Circuit have also held that a class of more than forty people generally satisfies the numerosity requirement.[74] "It is also important to note that Plaintiffs need not know the exact size of the class but where general knowledge and common sense would indicate that it is large, the numerosity requirement is satisfied." [75]

Plaintiffs submit, and Defendants do not challenge, that "Exxon's own data, as of October 8, 2004, show that the wells on at least 175 properties in the area have had some level of MTBE." [76] Even if there is only an average of two homeowners per well, then at least 350 homeowners would comprise the

---

not specified in Rule 23, the Court must be able to ascertain the *general boundaries* of the proposed class at the outset of the litigation, and the named Plaintiffs must be members of the proposed class.") (emphasis added); *Manual for Complex Litigation* § 21.222 (4th ed. 2004) ("Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable.").

67. Of course, the jury will also need to find that the gasoline leaked due to Defendants' conduct (*e.g.*, negligence).

68. *See Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir.1972); *see also Twyman v. Rockville Hous. Auth.*, 99 F.R.D. 314, 320 (D.Md.1983) ("The main concern is 'adequately delineated' so that 'at the time of judgment the individual members of the class will be readily identifiable.' ") (quoting *Hammond*, 462 F.2d at 1055); *Byrd v. International Bhd. of Elec. Workers, Local 24*, No. 72–848–M, 1977 WL 875, at *6 (D.Md. June 21, 1977) ("The practice in this Circuit in employment discrimination suits is to define the classes, in part, by reference to the specific employment practices which will be challenged on a class basis at trial and after trial by reference to the specific practices on which the court makes a final judgment.") (citing various Fourth Circuit cases).

69. *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir.1975) (emphasis added).

70. Moreover, the Court is able to determine that the Plaintiffs seeking to represent the class are members of the putative class. *See In re A.H. Robins*, 880 F.2d at 728.

71. Fed.R.Civ.P. 23(a)(1).

72. 720 F.2d 326, 333 (4th Cir.1983).

73. *Id.*

74. *See, e.g., Mitchell–Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556–57 (D.Md.2006) ("Plaintiffs estimate the number most certainly would exceed the 40 members generally accepted to be sufficiently large to make joinder impracticable. In this circumstance the numerosity prong of Rule 23 is satisfied."); *Newsome v. Up–To–Date Laundry, Inc.*, 219 F.R.D. 356, 360–61 (D.Md.2004) ("Generally, fewer than 20 employees will not satisfy numerosity although more than 40 will.").

75. *Mitchell–Tracey*, 237 F.R.D. at 556 (citing 6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:3 (4th ed.2006)).

76. Pl. Mem. at 11 (citing Groundwater & Envtl. Servs., Inc., Site Assessment Report at 13 (Oct. 8, 2004), attached as Ex. 4 to Pl. Mem.).

Homeowners Subclass.[77] The numerosity requirement is therefore satisfied.

## C. Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."[78] Common questions of law or fact almost always exist if the claims of the class arise from the same wrongful acts or underlying set of acts or circumstances.[79] Moreover, the commonality requirement does not require class members to share all issues in the action, but only a single common issue of law or fact.[80]

Plaintiffs have submitted, and Defendants do not challenge, a number of questions of law and fact that the members of the Homeowner Subclass have in common:

a. Whether Defendants released MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon;

b. Whether MTBE reached, or will reach, the subsurface and/or groundwater beneath the area encompassed by the Homeowners' Sub-Class;

c. Whether Defendants' release of MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon was negligent, reckless and/or intentional;

d. Whether Defendants' release of MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon constituted an unreasonable interference with the Plaintiffs' and the Class's use and enjoyment of their property;

e. Whether Defendants' release of MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon physically

invaded the properties of the Homeowners' Sub–Class, so as to constitute a trespass;

f. Whether Defendants' release of MTBE and other contaminants into the soil and groundwater of the area surrounding the Crossroads Exxon constituted an unreasonable interference with rights common to the general public, so as to comprise a public nuisance;

g. The costs of sampling, investigating and restoring the groundwater beneath the region encompassed by the Homeowners' Sub–Class, in order to assess the amount of the Homeowners' Sub–Class's claims for restoration damages;

h. Whether medical monitoring is appropriate for the cohort comprising the Medical Monitoring Sub–Class, and, if so, the extent, frequency and duration of such monitoring; the types of tests that are appropriate for the types of exposure experienced by the cohort; and the nature of expected results from a non-exposed cohort;

i. Whether existence of MTBE in groundwater creates acute and chronic health hazards to residents; and

j. Whether contamination of groundwater by MTBE adversely affects or impairs market value of residential property.[81]

The commonality requirement is therefore satisfied.

## D. Typicality

Rule 23 requires the named plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."[82] "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims."[83] "The prem-

---

77. *Accord* Compl. ¶ 38 ("Upon information and belief, Plaintiffs aver that the Class is composed of at least 360, and possibly many more, members.").

78. Fed.R.Civ.P. 23(a)(2).

79. *See Holsey v. Armour & Co.,* 743 F.2d 199, 216–17 (4th Cir.1984).

80. *See id.; see also Peoples v. Wendover Funding, Inc.,* 179 F.R.D. 492, 498 (D.Md.1998).

81. Compl. ¶ 39; *see also* Pl. Mem. at 12–13.

82. Fed.R.Civ.P. 23(a)(3).

83. *General Tele. Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980).

ise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." [84]

■ Each of the named Plaintiffs' claims arise from the same alleged course of conduct (*i.e.*, the gasoline leak) that gives rise to the claims of other class members.[85] Their claims are also based on the same legal theories.[86] The close nexus between the claims of the proposed representatives and the claims of the class assures that Plaintiffs will advance the interests of all class members as they pursue their own claims.[87] The typicality requirement is therefore satisfied.

### E. Adequacy

Rule 23(a)(4) requires that Plaintiffs demonstrate that the "representative parties will fairly and adequately protect the interests of the class." [88] This requirement serves two purposes. *First*, it seeks to "uncover conflicts of interest between named parties and the class they represent." [89] *Second*, "[t]he adequacy heading also factors in competency and conflicts of class counsel." [90]

■ Defendants argue that "acute intra-class conflict makes representation of any 'class' impossible." [91] In particular, Defendants contend that "many putative class members are themselves likely sources of MTBE contamination—and they may have unintentionally contaminated both their own

drinking water wells and the wells of other putative class members." [92] According to Defendants, "neither the named Plaintiffs nor any other putative class members can fairly and adequately prosecute 'class' claims against Exxon Mobil while also prosecuting claims against one another." [93]

As their only example, Defendants point to Gail and Robert Kurtz who "exemplify the problem" [94] because two of their neighbors *may* have "caused (at least in part) the very contamination they complain of" [95] with either above-ground storage tanks or leaking heating-oil tanks.

Defendants' argument fails for three reasons. *First*, the fact that Defendants believe that Gail and Robert Kurtz may have claims against their neighbors has no bearing on the adequacy of the *other* named plaintiffs in representing the Homeowner Subclass against Exxon Mobil and the station owner. *Second*, Gail and Robert Kurtz have not claimed that their neighbors contaminated their property or otherwise harmed them, and conflicts that are merely hypothetical or speculative do not defeat certification.[96] *Third*, Defendants' argument does not undermine the fact that Gail and Robert Kurtz have a sufficient interest in this action against Exxon Mobil and the station owner to adequately represent the interest of all class members in pursuing those same

84. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir.1998) (quotation marks and citation omitted). *Accord Deiter v. Microsoft Corp.*, 436 F.3d 461, 466–67 (4th Cir. 2006) (discussing the typicality requirement).

85. Compl. ¶¶ 3, 20.

86. *See id.* ¶¶ 44–80.

87. *See Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir.2001) (holding that " 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members' ") (quoting *Falcon*, 457 U.S. at 156, 102 S.Ct. 2364).

88. Fed.R.Civ.P. 23(a)(4).

89. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

90. *Id.* at 626 n. 20, 117 S.Ct. 2231.

91. Def. Mem. at 14.

92. *Id.*

93. *Id.*

94. *Id.*

95. *Id.* at 16.

96. *Gunnells*, 348 F.3d at 430 (noting that, to defeat certification, conflicts "must be more than merely speculative or hypothetical"); *cf. Broussard*, 155 F.3d at 337 (holding "manifest conflicts of interest" among members of class preclude class certification). Of course, Defendants may choose to bring third-party claims against other potential tortfeasors, although they have not done so in the fifteen months since the First

claims.[97] The fact that other people may, or may not, have harmed them does not undermine the interest they have in pursuing their claims and remedies against the named Defendants. Indeed, there is no doubt that each of the named Plaintiffs will pursue their claims against the Defendants and therefore adequately represent the class.

Finally, with respect to the proposed counsel for the class, Defendants have not objected to counsel that Plaintiffs have selected, the Law Offices of Peter G. Angelos, PC. Indeed, Plaintiffs' counsel has handled numerous actions of similar or greater complexity including, for example, representing tens of thousands of plaintiffs in asbestos litigation and the state of Maryland in tobacco litigation.[98] The Court easily concludes that Plaintiffs' counsel is qualified to handle this litigation and will vigorously pursue Plaintiffs' claims.[99] The adequacy requirement is therefore satisfied.

## F. Maintainability

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."[100] Numerous courts, including this Court, have certified class actions asserting claims that property was harmed by seepage of a particular waste or other harmful substance.[101] The claims of the Homeowner Subclass are remarkably similar to those pursued in these cases. Because "liability can be resolved by a jury with a single decision that applies to the whole class, and the only individual question left to resolve relates to damages, class certification is warranted."[102]

The remaining issue is under which provision of Rule 23(b) should the class be certified. The Fourth Circuit has held that if certification is appropriate under both Rule 23(b)(1) and Rule 23(b)(3), a court must certify the class under the former so that any resulting judgment will have res judicata effect as to the entire class.[103] Defendants argue that because the Plaintiffs primarily seek money damages, certification under Rule 23(b)(1) is not proper.[104]

However, the Fourth Circuit rejected a similar argument by the defendant in *A.H. Robins*:

> Some courts have gone further and have held that Rule 23(b)(1)(A) was not de-

---

Amended Complaint was filed on December 19, 2005.

97. *See Barnett v. W.T. Grant Co.*, 518 F.2d 543, 548 (4th Cir.1975) (holding that a class representative was adequate because "as one who has allegedly been aggrieved by some of those actions he has demonstrated a sufficient nexus to enable him to represent others who have suffered from different actions motivated by the same policies").

98. *See, e.g.,* Howard M. Erichson, *Informal Aggregation: Procedural and Ethical Implications of Coordination Among Counsel in Related Lawsuits,* 50 Duke L.J. 381, 387 (2000) (citing a National Law Journal Article that explained the Law Offices of Peter G. Angelos had represented nearly 20,000 asbestos plaintiffs). The law firms of Brower Piven and Engel & Engel, P.A. are also well-qualified to represent the class based on their litigation experience.

99. Moreover, "[i]n the absence of proof to the contrary, courts presume that class counsel is competent and sufficiently experienced to prosecute vigorously the action on behalf of the class." *Miller v. Optimum Choice, Inc.,* No.2003-3653, 2006 WL 2130640, at *1 (D.Md. July 28, 2006).

100. *Amchem,* 521 U.S. at 614, 117 S.Ct. 2231.

101. *See supra* note 60 (collecting cases).

102. *In re MTBE Prods. Liab. Litig.,* 241 F.R.D. at 448, 2007 WL 25474, at *5.

103. *See In re A.H. Robins,* 880 F.2d at 728; *see also Lutz,* 196 F.R.D. at 453 n. 8 ("However, if an action qualifies for class certification under Rule 23(b)(1) and/or (b)(2), as well as (b)(3), then it should be certified under (b)(1) and/or (b)(2), but not under (b)(3).") (citing *In re A.H. Robins* ); *Peoples,* 179 F.R.D. at 492 ("Although Plaintiffs do not address certification under Rule 23(b)(1), the Court must analyze the possibility ... [that] certification is appropriate under both Rule 23(b)(1) and Rule 23(b)(3) ....") (citing *In re A.H. Robins* ); *Atwood v. Burlington Indus. Equity, Inc.,* 164 F.R.D. 177, 177 (M.D.N.C.1995) ("The parties appear to agree, and the court finds that certification, if done, should be carried out under Rule 23(b)(1). Although the class appears to be certifiable under subsection (b)(1) or (b)(3)....."); *Washington v. Aircap Indus. Corp.,* No. 2:91-3153, 1992 WL 547993, at *1 (D.S.C. July 8, 1992) (ordering the parties to brief whether certification was proper under Rule 23(b)(1) or Rule 23(b)(3)) (citing *In re A.H. Robins* ).

104. *See* Def. Supp. Mem. at 4.

signed to encompass class suits that seek damages relief. Such a limitation not only is unsupported in the language of the subdivision but also is contrary to the prevailing precedents which construe the various class categories of Rule 23(b). This construction of Rule 23(b)(1)(A) has been generally rejected or not followed by prevailing precedents.[105]

Moreover, in *Kohl v. Association of Trial Lawyers of America*, the District of Maryland reached the same conclusion, relying on *A.H. Robins*.[106]

■ Thus, this Court must first consider whether Plaintiffs have satisfied Rule 23(b)(1). In this case, the prosecution of separate actions by members of the class would create "a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class."[107]

■ For example, if Plaintiffs pursue their negligence claims individually, there is a risk that one jury will find the Defendants acted reasonably while another jury will find that they breached a duty of reasonable care when the gas tank leaked. There is thus a substantial risk that the Defendants will face incompatible standards of conduct. Moreover, juries might well reach different conclusions on the factual issues that underlie this claim such as where the gasoline spread after it was leaked and which homeowners were affected.[108]

■ Similar arguments can be made about Plaintiffs' claims for public nuisance, private nuisance, trespass and strict liability for an abnormally dangerous activity. The only significant issue on which verdicts will vary is the damages that each property owner incurred, but as explained above, this does not defeat certification under Rule 23(b)(1) in the Fourth Circuit.[109] Class certification for these claims under Rule 23(b)(1)(A) is thus appropriate.[110]

## IV. THE MEDICAL MONITORING SUBCLASS DOES NOT SATISFY RULE 23

■ Plaintiffs also seek certification of a class consisting of "[a]ll persons residing in the area from 1989 until the present (inclusive) who have consumed and/or used

---

**105.** 880 F.2d at 880 n. 8 (quoting 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 4.04, at 276–77) (2d ed.1985); *cf. Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 123, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989) (holding that courts should interpret the Federal Rules according to their plain meaning).

**106.** *See* 183 F.R.D. at 486 (discussing *A.H. Robins*). In support of their position, Defendants cite *Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir.1986). *See* Def. Supp. Mem. at 4 n. 19. However, any limitation that *Zimmerman* placed on class certification based on a request for money damages was specifically rejected by the Fourth Circuit in *A.H. Robins*, which held that the *Zimmerman* decision contained only dictum on this point. *See* 880 F.2d at 730 n. 28; *see also Kohl*, 183 F.R.D. at 486.

**107.** Fed.R.Civ.P. 23(b)(1)(A).

**108.** There is an open question of whether absent class members may have a constitutional right to opt out of class actions that seek monetary damages on their behalf. *See Adams v. Robertson*, 520 U.S. 83, 85, 117 S.Ct. 1028, 137 L.Ed.2d 203 (1997) (dismissing the writ of certiorari as improvidently granted after briefing and oral arguments on the merits); *Ticor Title Insur. Co. v. Brown*, 511 U.S. 117, 122, 114 S.Ct. 1359, 128

L.Ed.2d 33 (1994) (same). However, for the reasons discussed above, *see supra* Part III, this Court is bound by the decisions of the Fourth Circuit which has decisively held that a mandatory class action asserting monetary damages may be certified and, in fact, should be preferred over opt-out classes.

**109.** Defendants argue that there are multiple sources of MTBE in the area (*e.g.*, other USTs). *See, e.g.*, Def. Mem. at 18. However, this is a class-wide defense that only further supports certifying the class. *See In re A.H. Robins*, 880 F.2d at 747 ("Just as the military [contractor] defense was central to the case in *Agent Orange*, so the question whether Aetna was a joint tortfeasor here was the critical issue common to all the cases against Aetna, and one which, if not established, would dispose of the entire litigation."). The leakage of other USTs in the area, if any, should be decided on a class-wide basis in order to avoid inconsistent findings on the issues of causation or damages.

**110.** The predominance and superiority requirements of Rule 23(b)(3) are also satisfied for the Homeowner subclass and thus, if the class were not certified under (b)(1), certification under Rule 23(b)(3) would be appropriate. *See supra* note 60 (collecting cases where courts have certified similar classes).

groundwater drawn from a supply well in the vicinity of the Crossroads Exxon." [111] In their Complaint and brief, Plaintiffs refer to this as the Medical Monitoring Subclass in reference to their medical monitoring "claim." [112]

In *Philip Morris Inc. v. Angeletti*, the highest state court in Maryland, the Maryland Court of Appeals, first considered "whether a demonstrated need for medical monitoring creates a valid cause of action in Maryland or generates a permissible form of relief under [Maryland's] more traditional tort actions, although several courts around the country more than a decade and a half ago began to consider this type of claim and permitted it to proceed." [113] Nonetheless, the Maryland Court of Appeals declined to resolve the issue and instead left "for the future whether, under Maryland law, plaintiffs could maintain a cause of action or claim to relief to recover the expense of medical surveillance." [114]

Thus, this Court must predict how the Maryland Court of Appeals will rule on medical monitoring once it considers the issue.[115] In *Angeletti*, the Court of Appeals recognized that "the medical monitoring claim may perhaps more accurately be deemed a remedy rather than a distinct cause of action." [116] The fact that medical monitoring should not be viewed as a distinct claim becomes obvious when one asks the simple question: If it is a separate claim, what are the elements that a plaintiff needs to prove to the jury in order to prevail? For example, the elements of negligence are (1) duty, (2) breach, (3)

causation, and (4) damages. There are no such elements with regard to medical monitoring.[117]

However, it makes perfect sense to view the costs of medical monitoring as the damages incurred from another tort or statutory violation committed by a defendant. For example, a prisoner might sue a correctional institution under the Federal Tort Claims Act and seek "compensatory damages for pain and suffering and future damages for continued medical monitoring and treatment." [118] Courts then refer to this as a "FTCA claim" where the damages sought relate to the cost of continued medical monitoring. Likewise, in this case, Plaintiffs have brought a number of tort claims and a jury might find that one of the damages suffered as a result of the tort includes the cost of medical monitoring. I therefore predict that Maryland will find that "medical monitoring" is best conceptualized as a question of damages, as opposed to a separate claim. Accordingly, I decline to certify a "Medical Monitoring Subclass." [119]

## V. CONCLUSION

Plaintiffs' motion for certification of the Homeowner Subclass is granted, while the motion for certification of the Medical Monitoring Subclass is denied. The Clerk of the Court is directed to close this motion (Docket No. 1141).

---

111. Pl. Mem. at 3.

112. *See* Compl. ¶¶ 81–95.

113. 358 Md. 689, 752 A.2d 200, 250 (2000).

114. *Id.* at 252.

115. *See Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir.1999); *see also In re MTBE*, 2005 WL 106936, at *13.

116. 752 A.2d at 253.

117. *See id.*

118. *Dabney v. Bledsoe*, No. 03 Civ. 193, 2006 WL 1376903, at *1 (N.D.W.Va. May 17, 2006). *Accord Luckerson v. Goord*, No. 00 Civ. 9508, 2002

WL 1628550, at *2 (S.D.N.Y. July 22, 2002) ("[Defendant's argument] ignores the various *remedies* plaintiff now seeks that the prison could provide. For example, the Complaint seeks medical monitoring, *a remedy* that, if warranted, the prison could provide (and, indeed, would be obliged to provide) during the period of plaintiff's continuing incarceration.") (emphasis added).

119. The Homeowner Subclass includes medical monitoring as part of its remedy since the class involves those people "owning real property in the vicinity of the Crossroads Exxon who have suffered a legally cognizable *injury* due to the contamination." Pl. Mem. at 2 (emphasis added). A jury could find that the costs incurred because of medical monitoring are part of the injury done to the Homeowner Subclass.